NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

IN RE DEPENDENCY AS TO A.M.

No. 1 CA-JV 26-0022

FILED 07-31-2026

Appeal from the Superior Court in Maricopa County
No. JD45270
The Honorable Katherine Cooper, Judge

**AFFIRMED**

COUNSEL

Robert D. Rosanelli Attorney at Law, Phoenix
By Robert D. Rosanelli
*Counsel for Appellant Takiyah M.*

Denise L. Carroll Esq., Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant Ali M.*

Arizona Attorney General's Office, Phoenix
By Anna V. Vaszar
*Counsel for Appellee Department of Child Safety*

Burguan Law PLLC, Phoenix
By Jessica J. Burguan
*Counsel for Appellee A.M.*

**MEMORANDUM DECISION**

Presiding Judge Andrew M. Jacobs delivered the decision of the Court, in which Judge Brian Y. Furuya and Judge James B. Morse Jr. joined.

**J A C O B S**, Judge:

¶1　　　　Takiyah M. ("Mother") and Ali M. ("Father") appeal the juvenile court's order adjudicating their infant son, A.M., dependent as to them after he suffered two fractures while in their care. Mother argues the record didn't establish that the parents had caused A.M.'s injuries and that the parents had successfully participated in reunification services. Father argues the record didn't show he caused A.M.'s injuries, the court improperly required him to explain how the injuries occurred, and the record showed no threat to A.M.'s safety because A.M. had returned home by the time of the adjudication hearing. Because reasonable evidence supports the juvenile court's order, we affirm.

## FACTS AND PROCEDURAL HISTORY

### A.　　A.M. Sustains Two Unexplained Fractures While in His Parents' Care.

¶2　　　　A.M. was born in May 2025. When he was seven weeks old, Mother took him to Banner Thunderbird Medical Center after he had intermittently emitted a high-pitched cry, vomited after feedings, cried unusually at night, and had what Mother described as a "dent" in his head. The parents had observed those symptoms for approximately one week but failed to seek medical care for A.M. But when Mother mentioned the indentation during a routine medical appointment for A.M.'s older siblings, the pediatrician told her to take A.M. to the emergency department.

¶3　　　　A CT scan showed A.M. had a non-displaced right parietal skull fracture. The parents claimed A.M.'s four-year-old sibling had squeezed the front and top of A.M.'s head a week earlier. The treating physician disagreed, concluding the reported incident was "not mechanistically compatible" with the fracture on the right side of A.M.'s skull. A member of Banner's Child at Risk Evaluation ("CARE") team likewise testified the sibling could not have generated sufficient force to cause the fracture as A.M.'s parents claimed. The CARE team also reviewed

A.M.'s birth records and found no evidence that birth trauma caused the fracture.

¶4 Two weeks later, the parents brought A.M. back to Banner for a repeat skeletal survey. It revealed A.M. also had a distal right femoral metaphyseal fracture (the "femoral fracture").

### B. DCS Provides Services, but Safety Concerns Remain.

¶5 After Banner reported the skull fracture, the Department of Child Safety ("DCS") implemented a fourteen-day present-danger plan that allowed A.M. to remain home with his paternal grandmother present as a responsible adult. When the plan expired, DCS' investigation remained open. The parents declined DCS' request to extend the plan and declined further interviews concerning the femoral fracture after learning there was also a criminal investigation into A.M.'s injuries. DCS thereafter removed A.M. and filed a dependency petition.

¶6 The parents had no prior DCS or criminal history. Father cooperated during the early investigation and testified that A.M. was never outside the parents' supervision, but he did not know what caused the skull fracture. The parents completed a parenting program, participated consistently in parenting time, and completed psychological consultations. Their progress led DCS to consider dismissing the case.

¶7 By trial, DCS agreed that A.M. could return home under an in-home dependency requiring daycare, additional parenting education, counseling, welfare checks, and other in-home services. A DCS specialist testified that dismissal could expose A.M. to further injury because the circumstances causing his fractures remained unidentified and unaddressed. The parents continued to rely on an explanation for the skull fracture that medical providers had rejected, provided no explanation for the femoral fracture, and had not demonstrated how they would prevent another injury.

### C. The Juvenile Court Finds A.M. Dependent, and the Parents Appeal.

¶8 The juvenile court held a four-day hearing at which both DCS and the parents presented witnesses and evidence.

¶9 There was no dispute at the hearing that A.M. suffered a skull fracture while in the parents' care. The parents and their counsel suggested A.M.'s sibling caused the skull fracture. But the only medical testimony at

the hearing was that the parents' explanation was incompatible with the skull fracture their infant son suffered while in their care.

¶10        There was dispute at the hearing over the femoral fracture. Dr. Gael Lonergan, a pediatric radiologist, testified A.M.'s femoral fracture was visible on both the initial and follow-up images. She testified that the fracture resulted from a "shearing" or "to-and-fro" force and was not caused by normal handling of an infant. Though Dr. Lonergan acknowledged the fracture was not independently diagnostic of abuse and could occur unintentionally, other CARE team providers later testified this type of fracture was highly suggestive of trauma inflicted on an infant who didn't walk, and couldn't have resulted from an ordinary diaper change or A.M. merely wiggling. The parents presented the testimony of three orthopedists from whom they sought a second opinion as to A.M.'s fracture: the orthopedic surgeon Dr. Vaughn, and two orthopedic physician's assistants, Morgan Stanley and Lauren Stafford. The orthopedists explained different ways femoral fractures can occur and how healed fractures can appear in imaging.

¶11        The court credited Dr. Lonergan's testimony over that of the orthopedic providers consulted by the parents. The court found Dr. Lonergan the "most qualified and reliable witness" concerning A.M.'s femoral fracture.

¶12        After considering the parties' evidence, the juvenile court found DCS proved dependency by a preponderance of the evidence because: (1) A.M. sustained two fractures while in the parents' care; (2) their explanation for the skull fracture was not medically plausible; (3) they had not explained the femoral fracture; and (4) they could not articulate an adequate safety plan to prevent a recurrence.

¶13        The court also found the parents delayed seeking treatment, minimized the seriousness of A.M.'s injuries, and failed to convey an understanding of DCS' safety concerns or explain how they would ensure proper supervision and prompt medical care in the future. It concluded those circumstances constituted "ongoing substantiated and unresolved threats" that would remain until the parents completed sufficient education and monitoring. The court adjudicated A.M. dependent and adopted a "Remain with Family" case plan.

¶14        The parents timely appealed. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1).

## DISCUSSION

### Reasonable Evidence Supports the Juvenile Court's Dependency Finding.

¶15        Father argues DCS failed to prove the dependency because no evidence established he personally inflicted either fracture. Mother likewise argues something besides child abuse could have caused the fractures. In the same vein, Father contends the court shifted the burden to him to explain the injuries and improperly treated the absence of an explanation as proof of abuse or neglect. Both parents argue no present threat remained because A.M. had returned to their home by the time of the dependency hearing. DCS responds that it was not required to identify who inflicted the injuries and that the medical evidence, the parents' inability to address the cause, and the conditions imposed on A.M.'s return supported the finding of an unresolved safety threat.

¶16        DCS was required to prove the dependency by a preponderance of the evidence. *Stephens v. State*, 262 Ariz. 233, --- ¶ 38, 589 P.3d 846, 856 (2026); A.R.S. § 8-844(C)(1). We review the juvenile court's dependency adjudication for abuse of discretion and affirm unless no reasonable evidence supports it. *In re G.R.*, 255 Ariz. 444, 447-48 ¶ 17 (App. 2023). Because the juvenile court is best positioned to assess credibility, weigh conflicting medical testimony, and resolve disputed facts, we do not reweigh the evidence on appeal. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282 ¶ 12 (App. 2002). And although dependency must be based on the circumstances existing at the time of the adjudication hearing, earlier events may support the ruling when they continue to present a "substantiated and unresolved threat" to the child. *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50-51 ¶¶ 12, 16 (App. 2016).

¶17        While Father wasn't required to prove he did not injure A.M., DCS likewise wasn't required to establish which parent or caregiver inflicted the injuries. *Joshua W. v. Dep't of Child Safety*, 1 CA-JV 21-0108, 2021 WL 5371203, at *3 ¶ 13 (Ariz. App. Nov. 18, 2021) (mem. decision) ("The law, however, does not require DCS to prove precisely how or why [the child] was injured while in Father's care."). The point, as the juvenile court correctly indicated, was that "[s]omething happened to [A.M.] in the home." A child may be dependent when a parent inflicted or allowed physical injury, or was unable or unwilling to provide adequate supervision or medical care, thereby creating a substantial risk of harm. *See* A.R.S. § 8-201(2)(a), (15)(a)(iii), (25)(a). The dispositive question was thus whether reasonable evidence showed that A.M. suffered abuse or neglect

while in his parents' care and that the conditions producing the harm remained unresolved.

**¶18** Reasonable evidence supports the juvenile court's finding. A.M., an infant in the first three months of his life, sustained two fractures while continuously in his parents' care. Medical providers testified the parents' account of the sibling squeezing A.M.'s head was incompatible with the location of, and force required to cause, A.M.'s skull fracture. While suggesting something besides parental abuse could have caused the fracture, the parents offered no medical testimony of their own to support that suggestion. The record thus contained sufficient evidence to support the juvenile court's finding of dependency.

**¶19** But there was also medical testimony that A.M.'s second fracture, of his femur, resulted from an abnormal shearing force not associated with routine infant handling. Father emphasizes that their inability to explain the cause of the fracture is not evidence of abuse. DCS responds that Dr. Lonergan nevertheless testified the fracture resulted from a shearing or "to-and-fro" force not associated with normal infant handling, and that other CARE-team providers testified it was highly suggestive of inflicted trauma and could not have resulted from routine care, an ordinary diaper change, or A.M. merely wiggling. The juvenile court credited the testimony that the fracture resulted from abuse or neglect. Father's challenge asks us to reassess competing medical opinions, which we will not do. *See Jesus M.*, 203 Ariz. at 282 ¶ 12.

**¶20** Nor did the juvenile court shift the burden to Father. Father argues the court relied on his inability to explain the injuries rather than affirmative proof of abuse or neglect. But as DCS argues, the lack of a credible explanation was not the sole basis for the dependency finding. The court also relied on medical evidence contradicting the parents' proposed explanation, the delay in obtaining care despite A.M.'s unusual crying, vomiting, and visible head indentation, the parents' continued minimization of the injuries, and their inability to articulate how they would ensure adequate supervision and prompt medical treatment. That evidence supported the finding that the circumstances causing the injuries remained unidentified and unaddressed; the court did not treat Father's lack of an explanation as proof that he inflicted them.

**¶21** The parents also argue A.M.'s return home defeated any finding of a present threat. DCS responds that it agreed to the return only under an in-home dependency requiring daycare, additional parenting education, counseling, welfare checks, and continued monitoring. A DCS

specialist testified those safeguards remained necessary because the circumstances causing the injuries had not been addressed and the parents had not demonstrated how they would prevent another injury. Thus, the return home did not establish that the threat had been resolved, but instead, that it could be managed through continued services and oversight.

¶22 The parents' cooperation, lack of prior DCS or criminal history, and participation in services weighed in their favor. But those circumstances did not account for how an infant sustained two fractures while continuously in the parents' care, reconcile the parents' explanation with the medical evidence, or establish an adequate plan to prevent another injury. The juvenile court considered the parents' evidence and nevertheless found the threat to A.M.'s safety demonstrated by the injuries inflicted while in his parents' care remained unresolved. Because reasonable evidence supports that finding, the parents have not shown the court abused its discretion.

**CONCLUSION**

¶23 We affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**: JR